IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| NATALIE HICKSON, et al.,  § | |
| Plaintiffs, § | |
| § | |
| v. § | Civil Action No. 3:18-CV-02747-B (BH) |
| § | |
| CITY OF CARROLLTON, et al., § | |
| Defendants. § | Referred to U.S. Magistrate Judge[1] |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Before the Court for recommendation is *Defendant Caleb West's Motion for Summary Judgment*, filed October 4, 2019 (doc. 38). Based on the relevant filings, evidence, and applicable law, the motion should be **DENIED**.

**I. BACKGROUND**

This civil rights action under 42 U.S.C. § 1983 arises from the death of Malcom Loren Hickson (Hickson) after he was shot by Carrollton Police Department (CPD) Officer Caleb West (Officer) during arrest. On November 23, 2018, Natalie Hickson and Lapresha Roquel Stanley, on behalf of herself and her minor son, and as the personal representative of Hickson's Estate (Plaintiffs), sued the City of Carrollton (City) and Officer in his official and individual capacities, alleging violation of Hickson's Fourth Amendment rights as well as state law survival and wrongful death claims. (doc. 13 at 1-3, 12-13.)[2] All claims against City and Officer in his official capacity have been dismissed, and only the claims against Officer in his individual capacity remain. (*See* docs. 27, 28, 29.)

---

[1] By *Standing Order of Reference* dated October 18, 2018 (doc. 5), this case was referred for full case management.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

On October 26, 2016, Officer was a Sergeant assigned to CPD's Covert Unit, which was responsible for investigating narcotics and vice crimes, and he also served on the NORTEX SWAT Team, which was responsible for responding to and addressing high risk critical incidents. (doc. 41 at 1.) According to Officer, at approximately 2:00A.M., another sergeant called and told him that a young woman had gone to the Carrollton police station the previous evening and reported that she had been held against her will as a sex trafficking victim, and that other women were still being held against their will. (*Id*. at 2.) The sergeant also said that CPD undercover deployment officers had tracked the suspect to a specific room at the InTown Suites in Carrollton, and he told Officer to contact other NORTEX SWAT members and to meet him at CPD headquarters. (*Id*.)

At approximately 3:00 A.M., Officer attended a briefing with other members of the SWAT team at CPD headquarters. (*Id.*) The suspect was identified as Hickson, and the team was advised of his "extensive prior criminal history . . . including a recent incident where Hickson had reportedly taken or stolen a handgun from his wife and threatened her with it." (*Id*. at 2-3.) The team was also told that Hickson had an outstanding arrest warrant for felony family violence/strangulation, and that he had allegedly threatened to kill his sex trafficking victims and their families if they reported the sex trafficking to police. (*Id.* at 3.) Officer himself had responded to or investigated several incidents in 2012 in which Hickson was alleged to have been involved in illegal shootings. (*Id.*) Based on the information they received, SWAT officers believed "there was a high probability that Hickson would be armed." (*Id.*)

Based on information that Hickson was staying at the InTown Suites, and that he would leave the motel every morning between 5:00 a.m. and 8:00 a.m. for about an hour, Officer and the SWAT team drove to the InTown Suites in an unmarked vehicle so as not alert Hickson to police

2

presence. (*Id.* at 3-4.) They believed he was holding other women in the motel, and they did not want to create a hostage situation. (*Id.* at 4.) The team planned to arrest him in the parking lot if he came out to his vehicle. (*Id.*) The team and CPD officers took up positions near Hickson's vehicle and around the perimeter, while a SWAT marksman positioned himself in a construction site next door to the motel and provided surveillance of Hickson's suspected room. (*Id.*) Around 8:00 a.m., a woman left Hickson's room and went to his vehicle, where she retrieved some bags. (*Id.*) When she headed back towards the room, officers detained her and took her away from the immediate area. (*Id.*)

After about twenty minutes, the officers heard over the radio that Hickson had left the room and was going to the parking lot, that he had something in the waistband of his pants, and that he was walking by the officers' unmarked vehicle. (*Id.* at 5.) The SWAT team exited their vehicle, and Officer called out to Hickson, loudly identifying himself as a police officer, and giving him "several loud verbal commands to put his hands up and not move." (*Id.*) The SWAT team members were all wearing "NORTEX SWAT uniforms with the word 'POLICE' conspicuously visible across [their] chests and back," and other members were also loudly identifying themselves as police and telling Hickson to stop and put his hands up. (*Id.*) According to Officer, Hickson did not comply and continued walking toward his vehicle, and Officer approached him to try and cut him off, all the while calling out to him to raise his hands and stop. (*Id.*) As he kept walking, Hickson twisted his torso from left to right and looked towards Officer, and Officer saw the handle of the handgun in Hickson's waistband. (*Id.*) Hickson then turned his torso to his left and moved his right hand towards the handle of the gun in his waistband. (*Id.* at 6.) Fearing that Hickson would attempt to shoot him or the other officers, Office fired a single shot from his rifle, striking Hickson. (*Id.*)

3

According to a witness who was working at a construction site next to the InTown Suites around the time of the shooting, he noticed a large police presence and saw officers taking different positions. (doc. 52-1 at 1.) A white male with tactical gear, and carrying a large rifle, walked past him. (*Id.*) Another worker at the construction site told the witness that the police were grabbing someone, and the witness turned and saw police grab an individual and put the individual in the back of a van. (*Id.*) After about 20 minutes, he saw a light-skinned thin male leave a room at the InTown Suites on the third floor and walk down the stairs and into the parking lot while appearing to look around for someone. (*Id.* at 2.) Within seconds of him reaching the middle of the parking lot, police officers rushed in and surrounded him, and one told him to put his hands in the air. (*Id.*) According to the witness, once the male was told to put his hands in the air, he did not keep walking, and he did not move his hands towards his waist or reach for a gun or anything at all. (*Id.*) As the male turned around to see who was yelling at him, the witness heard a loud bang, and he saw the male fall to the ground. (*Id.*) The witness avers that there were not multiple officers shouting and identifying themselves, and that the officers were calm and relaxed the whole time. (*Id.* at 2-3.) The male was shot as soon as he turned without being given a chance to stop, and it would have been impossible for him to do anything besides turn because he was shot as soon as he turned. (*Id.* at 2.) The witness could not see a gun on him. (*Id.*)

On October 4, 2019, Officer moved for summary judgment on the basis of qualified immunity. (doc. 39.) Plaintiffs filed a response and objection to Officer's motion for summary judgment, (doc. 50), but Officer did not file a reply.

## II. SUMMARY JUDGMENT STANDARD IN QUALIFIED IMMUNITY CASES

Summary judgment is appropriate when the pleadings and evidence on file show that no

4

genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

Typically, a movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record which reveal there are no genuine material fact issues. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In the context of § 1983 litigation, however, governmental employees asserting the defense of qualified immunity in a motion for summary judgment need only assert the defense in good faith. *See Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008); *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). They have no burden to put forth evidence. *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633-34 (5th Cir. 2000).

The burden then shifts to the non-movant to show that the defense does not apply. *See Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002) (en banc) (per curiam). The non-movant must identify specific evidence in the record and show how it presents a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324; *see also RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010). Although courts view the evidence in a light most favorable to the non-movant, *Anderson*, 477 U.S. at 255, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)). The

5

non-movant must show that the evidence is sufficient to support a resolution of the factual issue in his favor. *Anderson*, 477 U.S. at 249.

Here, Officer has carried his summary judgment burden by asserting the qualified immunity defense. *See Gates*, 537 F.3d at 419. Even though he has no burden to provide evidence, he has also submitted an affidavit. (*See* doc. 41.) The burden now shifts to Plaintiffs to identify evidence in the record creating a genuine issue of material fact regarding whether Officer violated Hickson's constitutional rights, and whether the violation was objectively unreasonable under clearly established law at the time of the violation. *See Zarnow v. City of Wichita Falls*, 500 F.3d 401, 407–08 (5th Cir. 2007).

### III. QUALIFIED IMMUNITY

Section 1983 "provides a federal cause of action for the deprivation, under color of law, of a citizen's 'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). It "afford[s] redress for violations of federal statutes, as well as of constitutional norms." *Id.* To state a claim under § 1983, a plaintiff must allege facts that show (1) he has been deprived of a right secured by the Constitution and the laws of the United States and (2) the deprivation occurred under color of state law. *See Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005).

A governmental employee who is sued under § 1983 may assert the affirmative defense of qualified immunity. *White v. Taylor*, 959 F.2d 539, 544 (5th Cir. 1992). Qualified immunity protects government officials performing discretionary functions from suit and liability for civil damages to the extent their conduct does not violate clearly established statutory or constitutional rights of

6

which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved as early as possible in the litigation. *See Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In deciding whether a defendant is entitled to qualified immunity, courts conduct a two-prong inquiry. Under the first prong, courts consider whether the facts alleged, taken in the light most favorable to the plaintiff, show a violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 200 (2001), *overruled in part by Pearson v. Callahan*, 555 U.S. 223 (2009). Under the second prong, courts determine whether the violated constitutional right was clearly established within the specific context of the case. *Id*. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. It is within the discretion of the court to decide which of the two prongs to address first in light of the circumstances particular to each case. *Pearson*, 555 U.S. at 236; *Lytle v. Bexar Cty.*, 560 F.3d 404, 409 (5th Cir. 2009). If the court answers both the constitutional violation and clearly established questions in the affirmative, the officer is not entitled to qualified immunity. *Lytle*, 560 F.3d at 410.

**A.** **Violation of Constitutional Rights**

Officer moves for summary judgment on grounds that his use of force did not violate Hickson's Fourth Amendment rights. (doc. 39 at 14-16.)

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A

7

seizure occurs when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 20 n. 16 (1968). "[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985)("there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). To succeed on a Fourth Amendment excessive force claim under § 1983, a plaintiff must show "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Goodman v. Harris County*, 571 F.3d 388, 397 (5th Cir. 2009); *accord Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir.2009).

Objective reasonableness is "a pure question of law" that is considered after determining the relevant facts. *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007). To gauge the objective reasonableness of the force used, the courts "must balance the amount of force used against the need for force." *Ramirez v. Knoulton*, 542 F.3d 124, 129 (5th Cir.2008) (quoting *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)). Proper application of this balancing test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. The reasonableness inquiry must consider "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

8

amount of force that is necessary in a particular situation." *Id.* at 397. Accordingly, the reasonableness of the force used is judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *id.,* and courts should avoid "second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation," *Ryburn v. Huff*, 565 U.S. 469, 477 (2012).

This "'objective reasonableness' balancing test is constrained'" when an officer uses deadly force. *Romero v. City of Grapevine*, 888 F.3d 170, 176 (5th Cir. 2018)(quoting *Flores*, 381 F.3d at 399 (quoting *Garner*, 471 U.S. at 3)). Its use "violates the Fourth Amendment unless 'the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.'" *Id.* (quoting *Garner*, 471 U.S. at 11.) Under these circumstances, the officer's use of deadly force is presumptively reasonable. *See Ontiveros*, 564 F.3d at 382 (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)); *see also Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009)("[a]n officer's use of deadly force is not excessive, and thus no constitutional violation occurs, when the officer reasonably believes that the suspect poses a threat of serious harm."). "'[W]here feasible,'" however, an officer should give a warning, which is "a critical component of risk assessment and de-escalation," before using deadly force. *Cole v. Carson*, 935 F.3d 444, 453 (5th Cir. 2019) (en banc) (quoting *Garner*). Courts "'must consider all of the circumstances leading up to [the moment deadly force is used], because they inform the reasonableness of [the officer's] decisionmaking.'" *Romero*, 888 F.3d at 177 (quoting *Mendez v. Poitevent*, 823 F.3d 326, 333 (5th Cir. 2016)). Nevertheless, "[i]t is well-established that '[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force].'" *Rockwell v. Brown*, 664 F.3d 985, 992–93 (5th Cir. 2011) (quoting

9

*Bazan ex rel. Bazan v. Hidalgo County*, 246 F.3d 481, 493 (5th Cir. 2001)) (emphasis original); *see also Amador v. Vasquez*, __ F.3d __, 2020 WL 2900759, at *5 (5th Cir. June 3, 2020) (the focus of the excessive force inquiry should be on "'the act that led [the officer] to discharge his weapon'") (quoting *Manis*, 585 F.3d at 845).

Here, Officer has provided a sworn affidavit stating that he and the SWAT team were all wearing NORTEX SWAT uniforms with the word "POLICE" visible across the chest and back when they approached Hickson in the hotel parking lot, and that he identified himself as a police officer and gave Hickson verbal commands to "put his hands up and not move." (doc. 41 at 5.) Hickson allegedly did not stop and continued walking towards his vehicle, and when Officer approached him, Hickson twisted his torso to the right, and Officer could see the handle of a handgun sticking out of the waistband of Hickson's pants. (*Id.*) Officer avers that Hickson then turned his torso to the left and moved his right hand towards the handle of the gun. (*Id*. at 6.) Fearing that Hickson would attempt to shoot him or one of the other officers, Officer fired a single shot from his rifle, striking Hickson. (*Id*.) Under Officer's verison of the facts, Hickson was reaching for the gun in his waistband, which led him to believe that Hickson was an imminent threat and that deadly force was justified. *See Ontiveros*, 564 F.3d at 384 (upholding the officer's use of deadly force when in defiance of a police officer's repeated orders to show his hands, the suspect reached into a boot for what the officer believed could be a weapon).

The burden now shifts to Plaintiffs to identify evidence in the record raising a genuine issue of material fact regarding whether Officer had probable cause to believe that Hickson posed an immediate threat to the safety of the officers or was actively resisting or attempting to evade arrest. *See Graham*, 490 U.S. at 396. Plaintiffs point to an eye witness affidavit contradicting Officer's

10

version of what transpired immediately before the shooting. (doc. 52-1.) It states that when one officer told Hickson to put his hands in the air, he did not continue walking to his car, but rather, turned to see who was yelling. (*Id.* at 2.) It also states that there were not multiple officers shouting and identifying themselves as CPD officers, and that the officers were calm and relaxed. (*Id.*) According to the affidavit, Hickson did not move his hands towards his waist or reach for a gun or anything at all; he was shot as soon as he turned without being given a chance to stop. (*Id.*)

Plaintiffs have identified evidence in the record creating a genuine issue of fact regarding Hickson's actions immediately before Officer shot him, which is material to the determination of whether Officer had probable cause to believe that Hickson posed a significant threat of death or serious injury to him or others. *See Flores v. Harris*, No. H-17-3817, 2019 WL 1426313, at *16-17 (S.D.Tex. Mar. 29, 2019)(citing *Lampkin v. City of Nacogdoches*, 7 F.3d 430, 435 (5th Cir. 1993)). Where the evidence raises a genuine issue of material fact, courts "assume plaintiff's version of the facts is true, then determine whether those facts suffice for a claim of excessive force under [the] circumstances." *Wagner v. Bay City*, 227 F.3d 316, 320 (5th Cir.2000); *Mason v. Lafayette City–Par. Consol. Gov't*, 806 F.3d 268, 276 (5th Cir. 2015) ("[I]n an excessive force-case on summary judgment, like any other case, a court must accept as true the evidence of the nonmoving party and draw all justifiable inferences in that party's favor."). Viewing the evidence in light most favorable to Plaintiffs, a reasonable jury could find that when one officer told him to put his hands in the air, Hickson stopped and only turned around to see who was yelling at him. It could find that he was not moving his hands towards his waist or reaching for a gun at the time Officer shot him, and that he was not given a chance to stop before being shot. This version of the facts suffices to establish a claim of excessive force. *See Baker v. Putnal*, 75 F.3d 190, 198 (5th Cir. 1996).

*Baker* involved a similar factual dispute regarding the decedent's actions immediately before he was shot by a police officer. *See id.* Witnesses told an officer patrolling a beach during spring break that a man had entered the crowd with a shotgun, and after gunfire rang out minutes later, other witnesses directed the officer to a car allegedly containing the shooters. *Id.* As he approached the car, he saw two men sitting in a truck parked on the beach, and when he neared it, the man in the passenger seat turned in his direction, and the officer shot and killed him. *Id.* A pistol was subsequently recovered from under the passenger seat. *Id.* The officer alleged that the man was holding a semi-automatic pistol, which he loaded with ammunition and then leveled at the officer despite being ordered to "freeze" or drop the pistol. *Id.* at 198. Three witnesses stated that the man took no threatening action as the officer approached the truck, and that the officer didn't say anything to the man before he turned toward the officer. *Id.* The Fifth Circuit noted that the witnesses' affidavits suggested that the man "may have barely had an opportunity to see [the officer] before [he] fired his gun," and that there disputes regarding whether the man took threatening action against the officer as he approached the vehicle, whether the officer said anything to the man before the man turned towards the officer, whether the man was even holding a pistol or pointing it at the officer, and whether he was facing the officer when he was shot. *Id.* Finding that there were "simply too many factual issues to permit the [plaintiffs'] § 1983 claims to be disposed of on summary judgent," the court reversed the district court's order granting summary judgment and remanded for trial. *Id.*

As in *Baker*, genuine issues of material fact exist as to whether Hickson was just turning when Officer shot him, whether he was reaching for a weapon when he was shot, and whether officers warned him, precluding summary judgment in Officer's favor on this prong of the qualified

12

immunity analysis. *See also Cole*, 935 F.3d 448-49, 457 (finding no error in denial of qualified immunity summary judgment motion based on a genuine issue of material fact where, under the plaintiffs' version of the facts, officers shot their teenage son without warning although he was holding a gun to his head, facing away from the officers and unaware of their presence, and never pointed a gun at them); *Keeton Geiger v. Sloan*, 780 F. App'x 150, 154-55 (5th Cir. 2019) (affirming denial of qualified immunity because there were disputes of material fact that bore on whether the officer perceived a threat of imminent harm before using deadly force, including whether he saw or could have seen a gun, and whether he shot because a gun was pointed at him); *Flores*, 2019 WL 1426313, at *16-17 (finding that the conflicting evidence regarding whether the gun in the plaintiff's waistband was visible to officers, whether the plaintiff reached for, was holding, or pointed the gun before being shot by officers, and whether the officers were in uniform or identified themselves as officers, was material and precluded summary judgment on the qualified immunity defense).

**B.     Objective Reasonableness in Light of Clearly Established Law**

Officer also moves for summary judgment on the grounds that his actions were objectively reasonable in light of clearly established law. (doc. 39 at 16.)

To show the inapplicability of the qualified immunity defense, a plaintiff must also present evidence to show that the violation of his constitutional rights was objectively unreasonable given the clearly established law at the time of the alleged constitutional violation. *See Zarnow*, 500 F.3d at 407-08; *Club Retro*, 568 F.3d at 194. This is an "entirely separate inquiry" from the reasonableness determination inherent in considering whether the Plaintiff has claimed a Fourth Amendment excessive force claim. *Ontiveros*, 564 at 383 n. 1. "The defendant's acts are held to be objectively reasonable unless all reasonable officials in the defendant's circumstances would have

then known that the defendant's conduct violated the United States Constitution or the federal statute as alleged by the plaintiff." *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 457 (5th Cir. 2001) (emphasis original).

In order for a constitutional right to be "clearly established" under the second prong, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Saucier*, 533 U.S. at 202. "Because the focus is on whether the officer had fair notice that [his] conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). The Supreme Court has repeatedly warned courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 742 (2011) (the general proposition "that an unreasonable seizure violates the Fourth Amendment is of little help"). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate," although a case directly on point is not required. *al–Kidd*, 563 U.S. at 741. When the constitutional violation is obvious, a materially similar case is unnecessary in order to find the law clearly established. *Hope v. Pelzer*, 536 U.S. 730, 738 (2002).[3]

---

[3]Qualified immunity "will not protect officers who apply excessive and unreasonable force merely because their means of applying it are novel." *Newman v. Guedry*, 703 F.3d 757, 763-64 (5th Cir. 2012) (rejecting argument that officer had no reasonable warning that tasing a suspect multiple times violated his constitutional rights because there was then no binding caselaw on the appropriate use of tasers). The Fifth Circuit has specifically recognized that the law may be "clearly established" even when there is no materially similar precedent in cases involving "extreme or egregious conduct that has been held to be a clearly established violation of a more general constitutional right." *Zimmerman v. Cutler*, 657 F. App'x 340, 346 (5th Cir. 2016) (citing *Hope*, 536 U.S. at 738 (officials handcuffed prisoner to hitching post for seven hours in mid-day heat); *Cole v. Carson*, 802 F.3d 752, 773–74 (5th Cir. 2015) (officer intentionally fabricated evidence to frame plaintiffs for a felony they did not commit); *Wilkerson v. Goodwin*, 774 F.3d 845, 858 (5th Cir. 2014) (officials held plaintiff in solitary confinement for nearly forty years)).

Recently, in *Morrow v. Meachum*, 917 F.3d 870 (5th Cir. 2019), the Fifth Circuit provided additional guidance for determining whether the law is clearly established in the context of excessive force cases. It began its analysis with a reminder that a plaintiff bears the heavy burden of proof to show that an officer violated clearly established law, and that a right is only clearly established "if relevant precedent has placed the constitutional question beyond debate." *Id.* at 874 (quoting *al-Kidd*, 563 U.S. at 741). Noting the amount of Supreme Court precedent "warning[] about the difficulty of placing a question beyond debate," it then set forth "four applicable commandments" distilled from that precedent: (1) courts "must frame the constitutional question with specificity and granularity;" (2) "clearly established law comes from holdings, not dicta;" (3) overcoming qualified immunity is especially difficult in excessive-force cases;" and (4) courts must think twice before denying qualified immunity." *Id.* at 874-876. The Fifth Circuit emphasized that the result in excessive force cases "'depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.'" *Id.* at 876 (quoting *Kisela v. Hughes*, 138 S.Ct. 1148, 1153 (2018)). Because officers are forced to make "split-second decisions" regarding the use of force, "the law must be *so* clearly established that – in the blink of an eye . . . every reasonable officer would know it immediately." *Id.* (citing *Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 582 (5th Cir. 2009).

As noted, Plaintiffs' version of the facts must be assumed to be true and viewed in the light most favorable to them. *See Wagner*, 227 F.3d at 320; *Anderson*, 477 U.S. at 255. Under their version, after being told by one officer (not multiple officers shouting and identifying themselves) to put his hands in the air, Hickson stopped and turned to see who was yelling at him, but he "was shot as soon as he turned" although he took no threatening action and did not move his hands

15

towards his waist or reach for anything. (doc. 52-1 at 2.) In *Cole*, the Fifth Circuit expressly recognized that under its prior holding in *Baker*, it was clearly established prior to 2010 that it was unlawful for an officer to shoot a person who was turning towards him when the person made no threatening movements toward the officer, was not warned by the officer despite an opportunity to do so, and may have barely had an opportunity to see the officer before being shot. *See Cole*, 935 F.3d at 453-54; *Baker*, 75 F.3d at 198.

In conclusion, Plaintiffs have met their burden to identify genuine disputes of material fact that bear on whether Officer reasonably perceived a threat of imminent harm. The factual disputes over what happened in the moments leading to Hickson's death are material to the question of whether Officer's actions violated a constitutional right that was clearly established at the time of the events in question. As in *Baker*, "[t]here are simply too many factual issues to permit [Plaintiffs'] § 1983 claims to be disposed of on summary judgment" in this case. *See* 75 F.3d at 198.

## IV. RECOMMENDATION

Officer's motion for summary judgment on the grounds of qualified immunity should be **DENIED**.

**SO RECOMMENDED** on this 16th day of June, 2020.

IRMA CARRILLO RAMIREZ  
UNITED STATES MAGISTRATE JUDGE

16

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

*/s/ Irma Carrillo Ramirez*
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE